Today we have four cases on the calendar, one of which will be early pardoning, the other three are submitted on the record. The purposes of today's recording, the three submitted cases are 2007-3217 Peterson v. Navy, 2007-5141 Moore's Cafeteria v. U.S., and 2008-3032 Withward v. MSBB. The early pardoning case is Muniauction v. Thompson Corporation. Mr. Raymond, will you clarify the minutes of the verdict? Yes, Your Honor, good morning. Good morning. May it please the Court. We would submit in light of this Court's decisions in BMC Resources and CK and the Supreme Court's decision in KSR, all of which issued after the verdict in this case, that the judgment here must be reversed at a minimum. Thompson is entitled to a new trial in light of the significant changes in the law as compared to jury instructions. Is the standard in the Third Circuit for a new trial based on the jury instructions? The standard in the Third Circuit is similar to the standard elsewhere, Your Honor, that we have to show an error in the instructions and we have to show prejudice to the case. We believe in all three instances we've done that here. Do you require to submit additional or different type of jury instructions in order to show prejudice? No, Your Honor, although in the case of BMC Resources, we did submit an instruction that was attempting to predict what the law was going to be, and the judge refused to give that instruction. Instead, he charged the jury, insisting it would be an on-demand case. Did you try to anticipate KSR? We tried to anticipate KSR as well, based on the Solicitor General's brief, and the judge refused to give that instruction, preferring instead to give what was the prevailing pattern instructions from the AIPLA. Were the crystal ball correct at that point? I think we were a little off, Your Honor, but I think Supreme Court precedent as well talks about where there's intervening changes in the law. It's the new law that's applied, and even if we hadn't objected at all, it would be the new law that would govern the facts. I'm not sure we can fault the trial judge for not predicting, since we never know what we're going to do either. Certainly not, Your Honor. But the question really is, what is the legal significance of the new law, not whether he or we were correct in terms of what we were predicting. It's our view that this Court's decision in BMC Resources, which there is a clear dispute among the parties in this case, that that case mandates an agency relationship in order for there to be a finding of liability for Thompson. Can I ask you, on the BMC question, just looking at the claims, one of the points you make, obviously, with respect to bidders, is the inputting language. Yes. If the inputting language, you know, in BMC we cited, I think, Professor Lumley's article, the suggestion that people just have to reconfigure their claims, that it's doable, it's just a matter of drafting. In this instance, if inputting is a change to receiving, would that fix your problem with respect to bidders in regard to that term? I think these claims could easily have been redrafted to read on a single party, such as Thompson, and they were not. Let me ask a second question on the joint infringement issue. I hope I can articulate the questions, but you'll know what's troubling me here. With respect to the issue, you focus on the parity, what's the parity exclusive versus the parity enabled stock. And frankly, that struck me as kind of a more infringement damages issue than necessarily a joint infringement, because you were looking at Thompson's alleged infringing device, and you were telling us it can go either way, depending on whether it's party enabled or party exclusive. If the party enabled stock isn't even infringing, then why does that inform our judgment with respect to joint infringement? And shouldn't we be looking at the claims themselves and not at the infringing device and how that operates? Well, I think, to respond to your question, I think the issue is this. These claims require different actors to do different things, and on the issuer side, the issuer has to display and look at bids that were submitted electronically. That is a decision entirely within the purview of the issuer. And you don't even have electronically submitted bids unless the issuer says, I will accept electronic bids with this particular auction. And nearly half of all municipal bond auctions don't have any electronic submissions at all. But in your view, those would not be infringing. I think that's absolutely clear. But that wouldn't implicate, then, the joint infringement issue with respect to the claim. I think that issue really goes to what decision-making ability the issuer has on that side of the process, if you will. I mean, they clearly have a decision they can make, which implicates whether there is infringement or whether there's non-infringement. To me, that's significant in terms of their freedom to operate, and certainly we have no control at all over whether they accept electronic bids or not. That is entirely the issuer's decision. But isn't displaying kind of a joint effort? I mean, who's to say who's to describe the issuer or the Thompson? No, the issuer has to sit at his or her computer and fire up the computer and log on to the Thompson website and go through the appropriate procedures in order for that information to be displayed. And there is no display if there's no electronic bids submitted. So that's a decision that they make. And, in fact, there's no bids submitted on the bidder's side unless the issuer says ahead of time, I will accept electronic bids in my auction. And then at that point, it's up to the bidder to decide whether they bid. But I'm quite certain that municipal bond issuers like the city of Milwaukee or the state of Tennessee would be quite shocked to learn that they are acting on behalf of Thompson when they auction off municipal bonds. And I think equally unlikely would be JPMorgan Chase and other large financial institutions who do the bidding on these would be equally shocked to learn that they're acting on our behalf when they bid. So I think it's very clear here, given the structure of these claims, that under BMC there simply is no infringement. I agree. And let me digress just a minute on one of your answers to Judge Gross. I thought it was very interesting. You acknowledge that these claims could have been drafted if you had to address one infringer, if you will, or one actor. And I don't know any reason why Thompson shouldn't be allowed to have the benefit of the law, if that's what the law is, that they could have been drafted but weren't. That's the same problem, of course, that BMC confronted. And the opinion in that case also instructs a little bit about how you could have drafted these claims. I suppose after the BMC opinion and whatever we may learn from this case, claim drafters will start drafting differently. What about prior claims that have been drafted in the same way? Have you thought about whether the doctrine of equivalence could be a solid rule of theory for patentees who have, if you will, misdrafted or at least drafted with multiple parties as actors? Would the doctrine of equivalence work in there? My answer to that is no for the following reason. The court in BMC— I recognize, by the way, that's not an issue in this case. So I'd rather ask you to sort of help me think through what to do about the next cases that are coming. The problem, in my opinion, with using the doctrine of equivalence is that doesn't deal with the problem of what 271A means and what Congress intended by the statute. According to BMC resources, Congress meant one actor. And I think the doctrine, in fact, relied on some Supreme Court case law on the doctrine of equivalence as informing its decision. It had to be one actor. It relied on the all-elements rule. So I think what the doctrine of equivalence is looking at is an entirely different issue, which is where you have the potential for a liable party, a single actor, and you make some change to some element of the claims, is that change significant? I think it's looking at a different issue. Still looking at the one actor. Yes. I think that's right. Would that apply also to other cases which change the law after a patent is issued, like KSR or MBCA? Yeah, I mean, I think it's pretty well settled that when there is an intervening change in the law, that law gets applied retroactively to all cases then pending or still on appeal, as well as cases not yet filed, unless the Supreme Court or the Court of Appeals says otherwise. And that was not the case in any of these decisions. Is there a constitutional deficiency of applying them retroactively? No. In fact, in the Supreme Court, this is pretty well settled. There's a well-known Supreme Court case, Boyle v. United Technologies, which actually this Court has applied in cases like Exxon v. Hoover's Law and others, that finds no constitutional problem in doing it. You may have noticed that last week the Supreme Court came out with an opinion in the media that reopens the whole question of retroactivity in certain kinds of cases. But apparently not as clear on this as you might have liked the law. But I think that Supreme Court case goes to the issue of allowing the states to apply retroactively. That is true. So that's a second duty type of issue. That's an interesting point. Whether or not there is a procedure of due process or even a session of due process, probably taking into account people in the chain of law. To my knowledge, that argument hasn't been adopted or embraced by— I recall in the Festo chain of cases there was an argument made about that. I believe that it was pretty clear that Festo was applied retroactively to patents, even though a very similar type of concern was raised. Can I turn your attention to the obviousness question? Absolutely, Your Honor. What evidentiary weight, if any, do we give to the patent examiner in this case, who has explicitly considered the records? The district court's opinion on J-Mall seems to have given that weight. Isn't that entitled to some weight in the obviousness analysis? I think that in this court's case law, it talks about a presumption of administrative correctness, but that it doesn't impact on the ultimate burden of proof of trial. The real problem here with putting too much emphasis on what happened at the patent office is the patent office only had about two-thirds of the story. They were missing key pieces of evidence, for example, user manuals, which we've got in the record here, which pretty clearly go through these claim elements, which are not—I would assume that in all fairness, they're not rocket science. And if you read the user manuals, which are dated 1992— Well, let's assume that hypothetical. Let's assume everything that there was to be had was before the examiner. And the examiner clearly looked at it, and he decided to break the patent. Then what are we going to do in a J-Mall situation? Let's assume the weight of trial was all of the evidence went the other way. Every single piece of evidence that came in the trial went the other way. Is that enough? I mean, do we consider that evidence in support of what the patent office did as evidence in support in terms of the weight of the legitimate J-Mall? I think this court in the past has not given that any evidentiary weight. It's merely impacted on this—the only comment has been you get a presumption of administrative correctness. But this court reverses jury verdicts on validity all the time where patents were granted. Even more patents were granted over the very same piece of prior art. And even if there was no evidence in support of prior arts missing? Yes. I think that's exactly right. And I would assume in this case, given the omissions that were made in this record and the clear documentary evidence, that there's no reasonable— no reasonable jury could have found that anything other than the web browser, which we concede wasn't part of our old software package, was in the prior art. And so the question really is a simple one under KSR. Now, moving back—I hate to move you back and forth. Moving back to the Joint Inquisition, what is the right standard? Is it a pure agency standard of control and direction? I think it has to be a pure agency standard because that is the only way to reconcile BMC with a long line of Supreme Court cases that say when Congress enacts a tort, it does so in the guise—under the guise of the ordinary common law vicarious liability principles. And unless Congress says you can apply some lower standard of vicarious liability, the Supreme Court has said standard common law agency is the only vicarious liability option. But pure agency under common law is not all that simple. No. The restatement is—I've been poring over the restatement in preparation for this argument. But there are some fundamental basic things. You don't need to restate the restatement. No, I don't think I could do that, Your Honor. You both understand that the common law has a rather flexible view of agency depending upon context and circumstance. Are you suggesting that we should be doing the same thing in these cases? Well, I think BMC, fairly in red, actually does invoke, I think, some of the important fundamental basics of common law agency. You have control over conduct. That is certainly—in law school you learn assent, benefit, and control are the sort of fundamental tenets of agency law. And that's true in the restatement as well. Does it have to be direct control? I think it has to be control of the conduct. I think a critical component of an agency relationship—this is true, I think, across the board— is that the principal has the power to control the conduct of the agent. And the agent has to be acting for the benefit of, on behalf of, which is a very, I think, clear concept, a very special concept within agency law. And that all has to be mutually agreed to. And I think that's basically the basic premise. So I think—I'm not exactly sure what direct control is, distinct from what I'm saying. What I'm saying is there has to be the power and the ability for the principal to control the acts of the agent. Or direct? I think the case law uses those terms interchangeably. The Supreme Court certainly does. They say control or direct. I don't think it's meant to be—there's meant to be a distinction between those two. Going back to KSI for a second, the old parody references in the prosecution. Can we say that the examiner did not properly understand all of the aspects of the old parody when it was studied? Or did not understand Mr. O'Neill? Mr. O'Neill, at least, during examination, did indicate that all of the methods, all of the steps, both parody of the acts of the agent and the product. That's right. And that's—he's the other side's expert. So I think it's clear from the record that the patent office did not have the whole picture. And so the examiner was doing the best job the examiner could do. And certainly we're not faulting the examiner for that judgment. I think this is a problem that occurs particularly in these kinds of patents where you don't have a wealth of documents and literature and publications for the examiner to pull out of an electronic database. It's a product that was marketed out of the world. So it's a question of how is the examiner going to get the best information, but how the product actually operates. With regard to the jointly active issue, in our view, Jamal, did we worry primarily about the trial for its instruction to the jury and whether that adequately stated the issue so that the jury was properly instructed? Or did we worry more about trying to do what the jury was supposed to have done even without any proper instruction? I think in the first analysis, that is looking to see whether judgment as a matter of law should have been granted, according to Boyle and Exxon, we take the law as it exists now and apply it to the record that was before the jury in that trial. And so for BMC Resources, we take that case and apply it to the record and see whether judgment as a matter of law is appropriate. The jury instructions come in. If the court feels that JMOL is not appropriate, the next step is to look at the jury instructions and see whether a new trial is warranted in light of the new law. So I think the jury instructions are relevant for that second part. I'm well beyond my allotted time. We will restore four minutes of your available time. Thank you, Your Honor. We will add some time to Mr. Barron's presentation. We have six minutes of Mr. Barron's time. Thank you. Good morning. Good morning. Judge Probst asked the question about the inputting step. That's an important step in this process. Two of the steps are carried out by persons other than Thompson. The inputting step is controlled by Thompson. Here's why. They provide specialized software to the bidder. Their software, designed by them, created by them, used to guide that bidder through the process, to assist that bidder in preparing the bid. Screens come up on the computer, and they tell you this is the format you have to use to have the bid. It is controlled because it guides them, it teaches them, it provides feedback if they make a mistake. It says caution if you've made a mistake. Do it the right way. That's part of the whole control. It verifies the bid parameters. You've put everything in, or you haven't put enough in, or you made a mistake in some way. That's the control. Whenever we go online to Amazon or anything else, there's always that screen that says put in all this information, which I always manage to fail to do. It flips up and says wait. When I say continue, it says no, you can't, because you forgot to put in just whatever it is. We go through all of that, but I always retain control over how much further I want to go. I don't have to push the continue button. There's no obligation, no cost to me if I don't. Amazon really doesn't control the question of whether I make an offer for a product. Why isn't that the same issue here? It's different because Amazon doesn't provide specialized software for you that can be used to create the bid. Amazon doesn't provide a contract that you sign that says you must submit the bid in this format. Amazon doesn't provide a contract on the other side for the issuers, for example, that says these are the criteria that you will see when you have a bid. Amazon doesn't order the bid parameters. So you have contractual relationships as well here that weren't present in BMC. You have control that wasn't present in BMC. There's one other point I'd like to make on this control issue because the jury instruction that the judge gave was the on-demand instruction. He talked about facilitating. He talked about instructing. He talked about teaching. He talked about connection. He didn't use the word control. We argued and urged the court to adopt the control measure, anticipating, perhaps, that this court might at some point in time say a direction of control. But the important thing, and this is in the record at A5752 through 5754, the closing argument, I gave the closing. We took the jury instructions and we took the jury through it and we talked repeatedly. In fact, 10 separate occasions in my closing, I said the issue here is control. Is there control? I said the law isn't. Judge Lancaster said if you're a person that does the connecting, you're the person that exercises the control. So are you suggesting that if there's really an erroneous, illegally deficient jury instruction, that can be cured by closing arguments? No, I'm not suggesting that. What I'm suggesting is that the issue of control was presented to this jury in the context of the instructions. And the more important thing is- Well, but the instructions say, as I read it, is kind of one of the things that allows you to find the joint infringement. Are they aware of each other's existence and interacting with each other in relation to the electronic auctioning process? That's not right. That's not enough. That's not enough. That's not enough. So whether or not the jury said, well, that's one of the questions that gets you to joint infringement. That's what the judge told us to do. That's what all we find. And therefore, we're fine. We're basing our group on that. Well, I think the jury was told, in addition to what Your Honor quoted, that you look at whether there's instructing, whether there's facilitating. Where is that in the jury instruction? In the jury instruction, you talk about facilitating, instructing, teaching. And it says, is there one party teaching, instructing, or facilitating the other party's participation in the electronic auction process? But, Mr. Merrill, my problem with even that sentence is that's exactly what Amazon does for me. Amazon teaches me, instructs me, and facilitates my participation in buying a book from them by putting up the screens that I'm supposed to respond to or put my order in. And you just a minute ago said, no, no, that's different. But I don't see how the language, is there one party teaching, instructing, or facilitating the other party's participation, cures this instruction at all. Do you think it does? I think that the instruction clearly says directing. I think instructing, teaching, facilitating is directing. It doesn't say control. But I would suggest that, and this court has said repeatedly, on JMOL, the jury instructions become somewhat, if not totally, irrelevant. What you look at is, is there substantial evidence to support the verdict? And I think counsel conceded that. Is there substantial evidence to support the verdict under the law, as this court has now articulated? We didn't have the benefit of BMC. If we had the benefit of BMC, we would have tried the case with that instruction. But I don't think it would have made any difference, because substantial evidence supports the verdict of this jury under the BMC standard. There was evidence of direction, evidence of control. Indeed. Even if the inputting step was done by the bidder, it essentially is done independently of Thompson. The inputting step. But there's no information in the records to the bidding process itself from the bidder going to the system. Well, there is. Thompson does not tell them what to bid. No, they don't tell them the amount to bid. They tell them the format. They tell them how to put it together. But the system tells them how to format it, just like eBay did. Well, I think it's— Formatting a particular bid. Well, it's different than eBay. If you go through this sequence, this contractually required sequence of steps, and eBay doesn't sign a contract that says, you must supply this data to me in this way or you're disqualified. This is an auctioneer that sets the rules for the auction, and the rules have to be complied with. If you don't comply with the rules, your bid will not be considered. Your bid will not be submitted. This is the ultimate control. This is the auctioneer. And I think one has to step back and look at it in that light. If Sotheby has an auction and they prescribe the rules, if I'm a bidder at a certain auction and I raise my paddle at a particular point in time, that means that I've made a bid. Correct. Does that mean that Sotheby has instructed me to do it that way? No, I don't think we could say that they've instructed you to raise the paddle or they've instructed you as to the amount that you bidded. That's not the controlling step, but one has to look at the step that's defined in the claim of the paddle, and it says inputting the bid to the server, effectively, that's operating. If I'm in a Sotheby auction, I'm inputting my bid? Yes, you are. Without any control from Sotheby? Well, if they define the rules and they define the criteria and they guided you through the process and they provided a computer screen for you to do it, that is, this is the software that I give you, specialized software, not software you can go buy, and we have a contract, it seems to me that satisfies BMC. If BMC requires that you have to tell a bidder what the amount of a bid is, then there's absolutely no way that that's happening. Yes, but now you're touching on Mr. Rainey's point, and I was wondering what your response to that is. Mr. Rainey suggested that your inventor could have drafted these claims so we didn't have to ask my understanding, thank you. Your inventor could have drafted these claims so that they were all done by a single actor, and he suggested that your claims were basically flawed in that respect. What is your reaction to that? Well, I think with hindsight, one can always say you could write claims better or different. With the benefit of BMC, yes, I would say, sure, you could have written the claims in a different way, but that's not what BMC said. BMC said, didn't say that you must rewrite claims, and the claims must be written in a way where a single actor does each of the steps. But BMC said, at least in two of the, I shouldn't tell this court, this court, two of the judges here were on BMC, but as we read this. I wasn't known as a super-duper. Okay. The BMC case, as we read it, as we read it, seems to say, look, there are instances where vicarious liability exists. It doesn't have to be an agency relationship. It has to be one where that person, that entity that is responsible for the acts of this third party directly control, and it's for control. And we think, in this instance, there is overwhelming evidence of direction and control. And that evidence was presented to the jury and was argued to the jury as the basis for its verdict. Just to discuss BMC a little bit, do you think it specifically requires an agency relationship? No, I don't think it does. It doesn't. The restatement, I've studied the restatement a bit, too, and it obviously doesn't deal with patent-type situations, but one of the examples it uses as to an agency relationship is a cook who's hired to work in a restaurant. The restauranteur doesn't say you have to use this recipe and you have to put it in this menu, but the restauranteur provides all of the tools and all of the things necessary to carry out the acts of the cook. That's an agency relationship. But I don't think in BMC it required an agency relationship. As we read it, at least, it says you're responsible, and vicarious liability exists if you direct or control. Here there's clear instruction. There's clear teaching. Unlike BMC, and this case could be laid side-by-side with BMC, there was no evidence presented of control in BMC. At least that's what this court said. There wasn't a factual record developed. That was on summary judgment. There was no direct control. On the record, it showed direct control. That's right. But here there was evidence of direct control. There was evidence here that software, specialty software was supplied. That wasn't the case in BMC. There was a contractual relationship, written contracts in this case, not present in BMC. There was instruction and direction as to how you use the data here that didn't exist, written instructions of what you have to do. That's instructing and directing that person on what to do. But there was guidance throughout the entire process provided by Thompson, not present in BMC. There were four separate entities that had to be controlled in BMC, only two here. And the process doesn't stop in BMC if the computer goes off in the central server. Here it does. Well, if the process step that's defined requires inputting data and you tell them how to input that data, then I would say the purpose is of carrying out that step with an agent. In the example you've given, Your Honor, I'm not sure I would because I think that's different than what occurs here. In this example, they give them the catalog and they tell them this is the way things go here. You've got bid and you want to bid. Why is that different than this? Because- You've given them instructions about how to operate within the system. Well, it's different because here you are guiding, instructing, telling the person how to do it in writing as part of the specialty software that they did. Now, I suppose you could say, well, the auctioneer sets the rules. That doesn't make you an agent for the auctioneer. And he sets the rules and he tells you what you have to do to follow. I think that in that instance, if there were a claim written under the appropriate parameters of writing claims that required an inputting step and there was sufficient direction and control, I think the MC would apply. Otherwise, you're wiping out any of the parameters. I suppose you could make the argument that in the Sotheby's case, if the director of the auction doesn't make his living by selling an auction, the contractual obligation is rather limited and not really very binding. But if there was a party at the auction house who's living depended on their participating in the auction, that person could be considered an actor, an agent of the auction house in the process of a joint commercial enterprise. I suppose you could make the argument that the parties in these transactions are indeed related commercially in that sense. Does that make sense? I wish I had thought of that, but I agree with that. I think, quite frankly, when you have a contractual relationship, and that's something that the court mentioned as being absent in BMC, you have a written contract that says if you want to bid on this municipal bond, if you want to participate in this process, you've got to follow my rules. You've got to follow my procedures. You have to format that bid in the way I tell you to do it. And it has to be the way I say it's put together. I'm not telling you what the amount is, but I'm telling you how you have to do it. And I'm instructing you. I'm advising you. I'm guiding you. And if you make a mistake, I tell you to correct it. And that's in writing. And if you don't comply on that end, you're out. Your bid will not be considered. Well, that's the way it works for us, doesn't it? I think, obviously, there's close parallels to an option that you might have in the Saudis or someplace. But I think it goes well beyond that traditional option of the type that we make. Because I'm not so certain, and I haven't been to any of those kind of options. I've been to a church option or something like that, which is a little less formal. But I don't recall ever having to sign a contract that says, if I don't raise my paddle to this level and raise it in a timely manner. Timing is another thing here that claims talk about. I keep the clock. One of the things that was happening here is under the old system, people would send in bids on faxes, and they'd say, I was on time because my fax machine said it was on time. But the other guy's fax machine said it didn't. They are the central timekeeper. So they determine how much time there is, and whether not only must you submit the bid in a particular format, but you have to submit it on a timely basis. It's part of the rules. I'm sorry. I want to turn to obviousness. I want to turn our attention to obviousness. It's an exhaustive and joint infringement issue. Sure. And I guess I've got two areas that I have questions on. One is that in your brief you say important trial evidence, notably the admissions of Thompson's own witnesses, showed that old parody did not perform at least four of the methods that's required under independent plan one. Correct. However, the evidence you cite in the appendix to support that, as I read it so you can tell me if I'm wrong, is simply the fact that during trial, Thompson's witnesses tried to set up some disk app or some experiment or something, and the network flopped, and it didn't work. So to the extent they admitted anything, they admitted that because this network wasn't hooked up right, they couldn't show what they had planned to show. But I didn't read anything you cited as being an admission that old parody did not perform those steps. So can you tell me what I'm missing here? Yes, I think Mr. Bradner, Dr. Bradner's testimony, based upon his report. Bradner's testimony, as I recall it, based on his report, admitted that a number between four and seven of the claimed elements were not present. I'll get the site here in a moment. And those included the true interest cost calculation, verification of bid parameters, that's at page 4866. That wasn't, well, what you cite, why don't you look at your brief on page 29, because that's where you, the statement I just quoted comes from there, and you have two sites, two appendices, in connection with that. If you want to offer, I'm happy to hear that too. Oh, that's in connection with Mr. Landis' testimony. Mr. Landis was the man that held, that had the disk. In the opening statement, they held up the disk like this. So did he admit that Old Parody did have those elements, or did he just acknowledge that it was obvious this experiment and that during the trial it wasn't, didn't work? He characterized this as an admission that Old Parody did not perform at least four steps, and I'm trying to find that. The point that was made was this. They held up this disk, and they said, we will show that this disk will operate and we're going to perform it before you. We'll make the invention as obvious as the nose on your face. And I asked him the question, so four of the steps in claim one you can't do in the courtroom. You have to pretend, right? With this disk, yes. But it's very interesting, Mr. Bradman said that he had an actual disk, and it didn't work either. This piece of prior art, the alleged piece of prior art that had a confidential stamp on it and wasn't even purportedly distributed, didn't do what they promised the jury it was going to do, which is to demonstrate that. In addition to that, there was testimony on it. Right, so you may be correct that they had promised that this disk was going to show it, and the disk didn't work. Correct. But I don't think that that equates to being an admission that the Old Parody system didn't have those four steps. No, and I don't think we cited for the proposition that that was an admission that it didn't have it. We cite... Well, the statement that proceeds the site says that quite clearly, unless I'm misreading something. The disk couldn't be used to demonstrate an actual bid being submitted or displaying information associated with the bid on an issuer's computer, nor could it communicate messages associated with the bid submitted by the issuer's computer. That's the... That the disk wasn't able to work. Correct. Demonstrate that. Correct. Not an admission that it did not... That's correct. That's correct.  including Mr. Bradman and other witnesses and Neil and others, testified and showed in detail that lacking from the disk, lacking from Old Parody, which was before the examiner, not once but twice, there was a withdrawal of the application from the issue so that additional information that Thompson had on Old Parody, they supplied all this information to our client, who in turn gave it to the patent examiner. Every bit of information they provided, they gave to the examiner. Our client gave to the examiner. There was no centralized clock. There was no use of a web browser. There was no ranking of bids. There was no outside observer. That's a 43... Well, let me ask you, let me turn to the interest computing aspect of it, that limitation. Other than the patent examiner's statements that were concluded in the file history, was there any other evidence on record on your side establishing that that was an aspect of the occurrence? That it was not there? Yes. There was testimony both of Mr. Harrington and, more importantly, of Mr. O'Neill. Mr. O'Neill, we've already... Well, he's... I mean, the O'Neill testimony you're talking about is the testimony that was subject to cross-examination and, at least from Mr. Rainey's point of view, sort of flipped on that, right? Well, he was asked some hypotheticals based upon testimony of Ms. Horowitz. She was called as an adverse witness. She testified there was a way... the things that old Perry had. And then he was asked a series of questions, some of which, I think, are quoted in the brief, some of which... all of which are in the record, the essence of which were this. Assume Ms. Horowitz is right, or would you agree? Can I interrupt you for a second? I thought that was in connection with the display element, not with respect to the interest computation element. It could be both. I don't know. I would have to look, but there are a lot of them. I think it was... I think there was the O'Neill testimony that was in connection with the interest computation. Right. And then there was the... Displaying stuff. ...testimony with respect to Ms. Horowitz. Displaying stuff. So, I mean, I'm open, but I... That's... I believe O'Neill... That's what was presented in the brief. So I read the Ms. Horowitz assertion issue as being related to this land. But, I thought... But in any event, in answer to my question, you also said if you understood O'Neill, you cited something else in your response a few minutes ago. I believe Mr. Bratton, in his report... Where is that testimony? In his report, he repeatedly said, may or may not have it, which is not clearly provisional evidence. You have a spike in the... There was a... yes. In the appendix A-82-43 and 44, there's a side-by-side comparison of Bratton's admissions versus the claims stats. Mm-hmm. That was a chart used at the trial and used in cross-examination, Mr. Bratton. So it's may or may not. That's right. That's not clear and convincing evidence of the existence of an element, I don't think. But I ask you... My question is whether there was evidence to support the fact that it can have it, whether it's may or may not. Right. Also, there was evidence in the form of the charts and then the examination of Mr. Bratton on those charts at A-82-52 through 53, which are, in red, some of the claim elements that aren't present. So there was quite a debate as to what was and what wasn't. O'Neill, when faced with some hypotheticals, and he said a couple times, I learned this morning from Miss Horowitz that this happened. And then he said, so I would agree with this or that. But immediately after that testimony redirect, he reaffirmed, reaffirmed that the elements, four of the key elements in claims 131 and seven of the elements from the defendant claims were simply not present in the whole paragraph. But during the presentation, he admitted that they were present. He admitted, if you take it outside of the context of the series of questions that were asked, yes, I think you could read it that way. But the reality is he was being asked a whole series of questions predicated on the prior testimony he had heard Miss Horowitz. And I think on five separate occasions, he said, well, if Miss Horowitz was right, if Miss Horowitz is correct, then yes, yes, yes. The first question he was asked on redirect, after he gave that testimony, not before, was, are these features present or not present in all the parodies in your opinion? And he said, they are not present. And then he explained why. Well, with respect to prosecution, I think one, the wearing clause added the lip-rod, it was added by the message. Right. It did not have the lip-rod added to it until there was a rejection of that. I think that's correct, Your Honor. And the only reason why that was probably issued by the judge, at least from what I could tell, is because all of the steps are shown in all the parodies except the lip-rod. I think as the claims 1 and 31, the examiner said in his reasons for allowance that he couldn't find anything that showed a web browser or the calculation of automatically calculating the true interest cost. The dependent claims, which are just as important as those independent claims, have a myriad of limitations that aren't present in all parodies, such as ordering and ranking the bids, such as bid verification. If there was no evidence in the record  There's evidence going the other way, but nothing on the side of the examiner or the examiner's statements. Well, that's not our case. But it might be. It might be. I think you'd have to look at the specific facts of the case. But in this case, on obviousness, after KSR, Judge Lancaster made a considered determination of whether or not the obviousness standard had been met, whether there was adequate proof. And he looked at all the grand factors, applied the grand factors. And although objective evidence sort of gets swept away here, this case is filled with objective evidence of non-obviousness. When this invention came to light, Thompson and the community said, you can't auction municipal bonds on the internet. That's for selling cars. He was vilified. There was commercial success to the point where they had 100% market share. And as a result of Thompson coming into the market and cutting the prices, it went down to 15%. There was a long felt need, a solution to a long felt need, problem, commercial success, and copy. We proved at trial that 18 features of their infringing system were identical to ours. And I think my time is up. Sorry. I think your time is up. And we'll have to have some time for Mr. Mayhew to do a little. Thank you very much. Thank you. I want you to have a few minutes. Just a few minutes. About equal time for everyone.  Thank you. Mr. Mayhew. Just a couple quick points, Your Honor. Your Honor, I'm hoping I won't need eight minutes to make these two points. But I'll do my best to be prompt. I think we've heard a lot about contracts. I don't think the contracts say anything about that they even come close to meeting the standard that the MC set forth. I would add, they're not even in the record. They weren't presented to the jury below, at least as far as we can tell. So I don't think they can be used to defend this court's judgment. We pointed that out in our brief. What do you think of Mr. Yarrow's distinction between the party with a commercial relationship and the casual dinner? Or to use the cook example, is there a difference in regard to the agency relationship if the cook is someone who is hired to cook and use the materials and equipment of the restaurant and a person who comes in on an occasion to cook having won the privilege at, if you will, a charity auction in terms of the agency relationship to the restaurant? The latter person bringing his own food, his own cook. Is there a difference in agency? There may be. One may be deemed an employee and one may be deemed an independent contractor, for example, just to use Yeah. And I think it depends on the facts and circumstances of the situation. You're going to have to find that in order to label someone an employee, that they have consented to being controlled by the company and that they are acting for the benefit of the company and that both sides have agreed to that. And I think that's a pretty standard formulation for a business relationship. So I think it depends on the situation. Unfortunately, like everything else in the law... What the situation is. Sure. I think it's very clear. I think it would be, as I said before, it would be rather surprising for the city of Milwaukee to hear, in their opinion, that it is acting as the agent of Thompson or under Thompson's control when it kind of issues an auction, as would JPMorgan Chase and the other investment banks who auction on these instruments. On the issue of obviousness, Mr. Niro mentioned the testimony of Mr. Bradman and this may or may not testimony. I think we dealt with this in our brief, but I just want to point out, if you look at his expert report and his testimony, what he said is that may or may not, when I wrote my expert report, depending on the judge's claim construction, it explicitly says that in the expert report, which was written prior to the judge's claim construction. After the judge construed the claims, he testified in direct that all of these limitations and there was no admission that elements were missing in the prior argument. That's all I have, Your Honors. Do you have any further questions? All rise.